UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

|  |  |  |
|---|---|---|
| WALTER SLOBODA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN GILLIS, LEE BRETTMAN, PATRICK HERON, ANDERS HOVE, DAVID MANN, SAMUEL SAKS, DAVID SCHNELL, TRUBION PHARMACEUTICALS, INC., EMERGENT BIOSOLUTIONS INC., 35406 LLC, and 30333 INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. C 10-1591<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, AND FOR VIOLATION OF STATE LAW BREACHES OF FIDUCIARY DUTY**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this action on behalf of the public stockholders of Trubion Pharmaceuticals, Inc. ("Trubion" or the "Company") against Trubion and its Board of Directors (the "Board") seeking equitable relief for their violations of Rule 14a-9(a) promulgated under the Securities Exchange Act of 1934 ("Rule 14a-9"), breaches of fiduciary duty and other violations of state law arising out of their attempt to sell the Company to Emergent BioSolutions Inc., 35406 LLC, and 30333 Inc. (collectively "Emergent") by means of an unfair process and an unfair price (the "Proposed Transaction"). Under the terms of the Proposed Transaction, each share of Trubion common stock will be converted into the right to receive an upfront payment of $1.365 per share in cash and 0.1641 shares of Emergent common stock. Based on the trading

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 4600
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

average of Emergent common stock for the five days prior to the signing of the agreement, the upfront payment is valued at approximately $4.55 per share, or approximately $96.8 million.

2.     Pursuant to the terms of the Proposed Transaction, Trubion shareholders will also receive one Contingent Value Right ("CVR") per share, which will entitle the holder to receive cash payments based upon the achievement of certain milestones. The total potential aggregate value of the CVRs is $38.7 million over a 36-month period.

3.     As described below, the value to be received by Trubion shareholders in the Proposed Transaction is unfair to Plaintiff and the other public shareholders of the Company because it does not adequately value the Company's future growth prospects, which will inure to Emergent if the Proposed Transaction is consummated.

4.     Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company.  Specifically, pursuant to the merger agreement dated August 13, 2010 (the "Merger Agreement"), defendants agreed to:  (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirors; (ii) a matching rights provision that allows Emergent to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay Emergent a termination fee of $3,000,000.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of Trubion.

5.     In addition, on September 13, 2010, Emergent filed a Form S-4 Registration Statement (the "Registration Statement") with the SEC in connection with the Proposed Transaction.  The Registration Statement fails to provide the Company's shareholders with

COMPLAINT - 2

material information and provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

6.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violation of their fiduciary duties of loyalty, good faith, due care, and full and fair disclosure and of Rule 14a-9.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14a-9. This court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

8.     Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District.  In addition, Trubion maintains its principal executive offices in Washington.

## PARTIES

9.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Trubion.

10.     Trubion is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principal corporate offices at 2401 Fourth Avenue, Suite 1050, Seattle, WA 98121, and is a biopharmaceutical company that is creating a pipeline of novel protein therapeutic product candidates to treat autoimmune and inflammatory diseases and cancer.

11.     Defendant Steven Gillis ("Gillis") has been the Company's Executive Chairman and Acting President since November 2009, and as a member of the Board since 2006.

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

12.     Defendant Lee Brettman ("Brettman") has been a director of the Company since 2002.

13.     Defendant Patrick Heron ("Heron") has been a director of the Company since 2002.

14.     Defendant Anders Hove ("Hove") has been a director of the Company since 2004.

15.     Defendant David Mann ("Mann") has been a director of the Company since 2006.

16.     Defendant Sanuel Saks ("Saks") has been a director of the Company since 2005.

17.     Defendant David Schnell ("Schnell") has been a director of the Company since 2004.

18.     Defendants referenced in ¶¶ 11 through 17 are collectively referred to as Individual Defendants and/or the Trubion Board. The Individual Defendants as officers and/or directors of Trubion, have a fiduciary relationship with Plaintiff and other public shareholders of Trubion and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

19.     Defendant Emergent BioSolutions Inc. is a Delaware corporation with its headquarters located at 2273 Research Boulevard Suite 400, Rockville, MD 20850 and is a biopharmaceutical company focused on the development, manufacture and commercialization of vaccines and antibody therapies that assist the body's immune system to prevent or treat disease.

20.     Defendant 35406 LLC is a Delaware limited liability company wholly owned by Emergent BioSolutions Inc. that was created for the purposes of effectuating the Proposed Transaction.

21.     Defendant 30333 Inc. is a Delaware corporation wholly owned by Emergent BioSolutions Inc. that was created for the purposes of effectuating the Proposed Transaction.

//

//

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

22.     By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of Trubion and owe them, as well as the Company, a duty of highest good faith, loyalty and full, candid and adequate disclosure.

23.     Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; (ii) a break up of the corporation's assets; or (iii) sale of the corporation, the Directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

24.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     participating in any transaction where the Individual Defendants' loyalties are divided;

COMPLAINT - 5

(b)     participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

25.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and good faith owed to Plaintiff and other public shareholders of Trubion, or are aiding and abetting others in violating those duties.

26.     Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest.  Defendants are knowingly or recklessly breaching their fiduciary duties of candor by failing to disclose all material information concerning the Proposed Transaction, and/or aiding and abetting other Defendants' breaches.

**CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION**

27.     In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

28.     During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) permit Emergent to attempt to eliminate the public shareholders' equity interest in Trubion pursuant to a defective sales process, and (ii)

COMPLAINT - 6

permit Emergent to buy the Company for an unfair price. In furtherance of this plan, conspiracy and course of conduct, Defendants, and each of them, took the actions as set forth herein.

29.     Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  The Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action on its own behalf and as a class action on behalf of all owners of Trubion common stock and their successors in interest, except Defendants and their affiliates (the "Class").

31.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of August 23, 2010, Trubion has approximately 20.42 million shares outstanding.

(b)     questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Have the Individual Defendants misrepresented and omitted material facts in violation of Section 14(a) of the Exchange Act;

(ii)    Have the Individual Defendants breached their fiduciary duties owed by them to Plaintiff and the others members of the Class;

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

(iii)   Have the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(iv)   Are the Individual Defendants, in connection with the Proposed Transaction, pursuing a course of conduct that does not maximize Trubion's value in violation of their fiduciary duties;

(v)   Have Trubion and Emergent aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(vi)   Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

(c)   Plaintiff is committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

(d)   Plaintiff's claims are typical of those of the other members of the Class.

(e)   Plaintiff has no interests that are adverse to the Class.

(f)   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

(g)   Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

**FURTHER SUBSTANTIVE ALLEGATIONS**

32.   Trubion is a biopharmaceutical company creating a pipeline of novel protein therapeutic product candidates to treat autoimmune and inflammatory diseases and cancer.  Their current product development efforts are focused on three proprietary technologies that comprise

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

the expanded foundation for Trubion product development – SMIP™ protein therapeutics, SCORPION™ protein therapeutics, and TRU-ADhanCe™ potency enhancing technology for immunopharmaceuticals. Their current clinical-stage therapeutics target specific antigens on B cells, CD20 and CD37, and are designed using their custom drug assembly technology.

### TRU-016 and the Company's Collaboration Agreement with Abbott

33.     TRU-016 is a novel CD37-targeted therapy for the treatment of B-cell malignancies, such as chronic lymphocytic leukemia ("CLL"). TRU-016 is currently in Phase 1 clinical development for CLL.   In August 2009, the Company entered into a collaboration agreement with Abbot Laboratories ("Abbott") for the joint worldwide development and commercialization of TRU-016.   The Company received an up-front payment of $20 million in cash in September 2009 *and may receive up to $176.5 million* in additional contingent payments upon the achievement of specified development, regulatory and sales milestones.

34.     The potential market for TRU-016 is tremendous. As stated in the Company's latest Annual Report:

> According to the National Cancer Institute, CLL is estimated to affect approximately 70,000 people in the United States. Approximately 12,000 new cases of CLL are diagnosed each year in the United States according to Datamonitor. In addition, NHL, another B-cell malignancy, is one of the most common types of cancer accounting for about 4% of all cancers. About 66,000 people in the United States are expected to be diagnosed with NHL in 2009 according to the American Cancer Society. Total reported worldwide sales of one of the most common used biologics in NHL, Rituxan® surpassed $3 billion in 2009.

35.     In an investor presentation dated August 2010 (the "Investor Presentation"), the Company touted the 4-5 billion dollar market for TR-016 and the product's numerous advantages:

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

## TRU-016 in a Nutshell

| | |
|---|---|
| **Markets** | • $4-5B Market in B-Cell Malignancies<br>• Potential Upside in Autoimmune/Inflammatory Diseases |
| **Demand** | • Need for Non-CD20 Therapy |
| **Product Advantages** | • Targets CD37<br>• Potent Anti-Tumor Activity<br>• Effective In Drug Combinations<br>• Potential Biodistribution Advantage |
| **Collaboration Status** | • 50/50 Joint Collaboration and License Agreement w/Facet<br>• Abbott Acquired Facet Q2 2010 |
| **Development Status** | • Phase 1 data presented at ASCO May 2009 and ASH Dec. 2009<br>• Ongoing Phase 1 monotherapy study |

### CD20 Products and the Company's Collaboration Agreement with Pfizer

36.     In December 2005, the Company entered into a collaboration agreement with Wyeth, now a wholly-owned subsidiary of Pfizer, for the development and worldwide commercialization of TRU-015, SBI-087 and other CD20-directed therapeutics. Pursuant to the agreement, the Company is also collaborating with Pfizer on the development and worldwide commercialization of certain other product candidates directed to a small number of non-CD20 targets.

37.     In collaboration with the Company, Pfizer is developing SBI-087, the Company's next generation CD20-directed product candidate for the treatment of rheumatoid arthritis ("RA"), Systemic Lupus Erythematosus ("SLE"), and other autoimmune and inflammatory diseases. In June 2010, Trubion presented positive data from a Phase 1 study of SBI-087 for RA and a Phase 1 study of SBI-087 for SLE at the 2010 annual congress of the European League Against Rheumatism. Data from both studies demonstrated that SBI-087 is

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

generally well-tolerated and results in potent B-cell depletion when given as a subcutaneous dose and with a day-of-treatment oral steroid regimen.

38.     Patient dosing has commenced and recruitment is currently ongoing in a Phase 2 trial of SBI-087 for RA evaluating safety and efficacy of subcutaneous administration of 200mg of SBI-087. In addition, patient recruitment is under way in an additional Phase 1 trial of SBI-087 for RA in Japan.  Finally, Pfizer is conducting a Phase 1 clinical trial of SBI-087 in SLE in which patient dosing has commenced and recruitment is ongoing.

39.     Pursuant to the collaboration agreement with Pfizer, Pfizer's financial obligations include payments to the Company *of up to $250 million* based on the achievement of specified regulatory and sales milestones for CD20-directed therapies and payments to the Company of up *to $200 million* based on the achievement of specified regulatory and sales milestones for therapies directed to the small number of retained non-CD20 targets. In addition, the Company will receive royalty payments in the event of future licensed product sales.

40.     The potential market for SBI-087 for the treatment of rheumatoid arthritis (RA) and systematic lupus erythematosus (SLE) is in the billions of dollars. As stated in the Company's latest Annual Report:

> According to Datamonitor, RA is estimated to affect approximately 5.2 million people in the United States, Japan and and the five major European markets. In 2009 *total reported worldwide sales of therapeutics used for the treatment of RA were greater than $10 billion.* Notwithstanding the administration of currently available treatments, approximately two-thirds of the RA patient population experiences pain, stiffness and fatigue on a daily basis. As a result, *we believe there is a large unmet medical need in the RA patient population for an effective drug therapy*. [Emphasis Added.]

With respect to SLE, the Annual Report states:

> According to Datamonitor, SLE is estimated to affect 236,000 people in the United States. The prevalence of SLE varies significantly on a country-by-country basis and could be up to five times greater with expanding disease definitions and increasing diagnosis. No new pharmaceutical or biologic treatments have been

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

approved for SLE in over 40 years. **We believe there is a large, unmet medical need in the SLE patient population** as SLE patients have a death rate three times higher than that of the general population despite the fact that most patients are young and middle-aged individuals. [Emphasis Added.]

41.     In the Investor Presentation, the Company described SBI-087's advantages and touted its "multi-billion dollar" market:



**SBI-087 in a Nutshell**

| Markets | • Proven, Growing, Multi-Billion Dollar Markets in Autoimmune and Inflammatory Diseases |
| Advantages | • Improved tolerability and more convenient dosing<br>• Humanized for reduced immunogenicity<br>• High potency |
| Collaboration Status | • Pfizer remains committed to the development of SBI-087 |
| Development Status | • SBI-087 for RA and SLE:<br>   » Phase 2 trial in RA – enrolling and dosing patients<br>   » Phase 1 trial in RA – enrollment complete; study ongoing<br>   » Phase 1 trial in SLE – enrolling and dosing patients |

*The Proposed Transaction is Unfair*

42.     Despite the tremendous potential of the Company's product pipeline, the Company agreed to enter into the Proposed Transaction.  On August 12, 2010, the Company announced that it had entered into a merger agreement (the "Merger Agreement") with Emergent pursuant to which Emergent will acquire Trubion for an upfront payment of $1.365 in cash and 0.1641 shares of Emergent common stock for each share of Trubion common stock.

43.     In addition, Trubion stockholders will also receive one CVR per share, which will entitle the holders to receive cash payments based upon achievement of five predefined Phase 2 and Phase 3 clinical study initiation milestones and one manufacturing-related milestone. The

COMPLAINT - 12

total potential aggregate value of the CVRs is $38.7 million over a 36-month period following

the closing of the merger.  Details regarding the CVRs are as follows:

| Milestone Events | Applicable Payments |
| --- | --- |
| Initiation of the first Phase 2 clinical study for TRU-016 | $1.75 million |
| Release of TRU-016 manufactured for use in clinical studies | $10.0 million |
| Initiation of dosing in the first Phase 2 clinical study for a non-CD20 target | $0.75 million |
| Initiation of the first Phase 3 clinical study in oncology indication for TRU-016 | $15.0 million |
| Initiation of dosing in the first Phase 3 clinical study for the first major indication for CD20 candidate | $6.25 million |
| Initiation of dosing in the first Phase 3 clinical study for the second major indication for CD20 candidate | $5.0 million |

44.     The consideration shareholders are to receive is inadequate. Trubion shareholders

are being cashed out at an unfairly low price, which doesn't adequately take into account the

tremendous market for Trubion's product candidates and the potential payments from the

collaboration agreements with Abbott and Pfizer. Emergent is picking up Trubion at the most

opportune time, at a time when Trubion is positioned for growth and its stock price is trading at a

huge discount to its intrinsic value.   Further, at least one Wall Street analyst had a price target of

$7.00 per share before the Proposed Transaction was announced.

45.     In addition, the *Discounted Cash Flow Analysis* conducted by MTS Securities,

LLC ("MTS"), the Company's financial advisor, yielded a value of Trubion as high as $7.00 per

share. The *Comparable Acquisitions Analysis* and the *Comparable Companies Analysis*

conducted by MTS yielded a value of Trubion as high as $12.00 and $8.00 per share

respectively.

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

46.     In a letter to Trubion's employees, Emergent's Chairman and CEO Fuad El-Hibri ("El Hibri") described the attractiveness of Trubion and the Company's growth potential stating in part:

> In a nutshell, it is all about Emergent's growth. We have for some time been focused on diversifying our product portfolio and making deeper inroads into the commercial marketplace where we believe we have the greatest opportunity to increase shareholder value. Your company -with its robust pipeline of promising products, its proprietary and innovative platforms, its therapeutic focus to serve unmet medical needs in oncology and autoimmunity, and most importantly its people - neatly fit our criteria for an attractive acquisition.
>
> * * *
>
> In closing, I would like to re-iterate that I believe this is a very exciting time. We have an opportunity here to do great science, significantly improve patients' lives, grow as individuals, and to jointly build a greater company. Together, I see great opportunities ahead. We are well-positioned to emerge as a leading biopharmaceutical company specialized in vaccines and biotherapeutics.

47.     In a conference call discussing the Proposed Transaction, El Hibri discussed the business, scientific, and financial advantages of the deal that Emergent was receiving., including that the deal provides additional clinical-stage therapeutic candidates in the targeted disease areas of oncology and autoimmunity; provides access to two novel, protein therapeutic platforms—SMIP, and SCORPION; gives Emergent access to scientific expertise for developing innovative, and high-value therapeutic candidates;  enables Emergent to internally generate first-in-class candidates; represents a minimal cash impact; and provides approximately 70 million dollars of NOLs.

48.     Jim Jackson, Emergent's chief scientific officer, was excited about the Company's product candidates and their therapeutic technology platforms. With respect to SBI-087, Jackson stated:

> SBI-087 is based on Trubion's SMIP technology platform and has been genetically modified to be a humanized and potentially more potent derivative of

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

TRU-015. ADDITIONALLY — SBI-087 has been FORMULATED for both intravenous infusion AND s.c. administration.

With respect to TRU-016-087, Jackson stated:

The second — very exciting — clinical stage product is TRU-016 — a fully human — FIRST-IN-CLASS - anti-CD37 protein therapeutic. TRU-016 is the only anti-CD37 currently in clinical development. As you are aware — CD37 is a cell surface marker present at high levels on B-cells and lower levels on certain types of T cells and myeloid cells. Experiments suggest CD37 may play a role in B-cell regulation. In addition, CD37 is known to be over-expressed in patients with CLL. Importantly — CD37 is a clinically validated target for the treatment of B-cell malignancies.

With respect to the Company's technology platforms, Jackson was excited about acquiring the Company's proprietary SMIP and SCORPION technology platforms and its potential to generate new first-in-class product candidates, stating in part:

Using these platform technologies — TRBN's scientists have identified and initiated development of several promising, potentially — high value preclinical candidates, which we plan to move into clinical studies in the near term.

While TRBN has thus far focused their SMIP and SCORPION technologies on the development of new products for autoimmunity and oncology — these platforms can also be leveraged for developing new candidates for infectious disease targets including biodefense.

And, finally, Trubion's TRU-ADhanCe™, which is an elegant, proprietary, manufacturing technology that can be employed to increase the antibody-dependent cellular cytotoxicity, or "ADCC", potency of product candidates by as much as 10-fold.

Trubion's core protein therapeutic platforms — have the potential to generate multiple new — FIRST-IN-CLASS — therapeutic candidates and, as a result, additional value to our R&D pipeline.

***The Preclusive Deal Protection Devices***

49.     On August 13, 2010, the Company filed the Merger Agreement with the SEC. As part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

50.     By way of example, §5.7 of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from attempting to seek a higher proposal from third parties.  This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors.  Despite the fact that they have locked up the Company and bound it to not solicit alternative bids, the Merger Agreement provides other ways that guarantee the only suitor will be Emergent.

51.     In addition, should an unsolicited bidder arrive on the scene, the Company must notify Emergent of the bidder's offer.   Specifically, pursuant to §5.7(d) of the Merger Agreement, the Company "shall identify the Third Party making, and details of the material terms and conditions of, any such Competing Transaction. The Company shall keep Parent fully informed, on a current basis, of the status and material terms of any such Competing Transaction, including any material amendments or proposed amendments as to price and other material terms thereof."   Thereafter, pursuant to §5.7(e) of the Merger Agreement, prior to recommending, approving or consummating a superior proposal, the Company must meet with Emergent and negotiate in good faith with Emergent to allow them to make adjustments in the Merger Agreement so that the competing bid ceases to constitute a superior proposal.

52.     In other words, the Merger Agreement gives Emergent access to any rival bidder's information and allows Emergent a free right to top any superior offer.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Emergent and piggy-back upon the due diligence of the foreclosed second bidder.

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

53.     In addition, the Merger Agreement provides that a termination fee of $3 million must be paid to Emergent by Trubion if the Company decides to pursue said other offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

54.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.  Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of Emergent's inadequate offer price.

55.     In connection with the Proposed Transaction, certain significant holders of Trubion common stock holding, in the aggregate, approximately 41% of the outstanding Trubion common stock, as of July 31, 2010 entered into Support Agreements, dated August 12, 2010 with Emergent (each, a "Support Agreement"), pursuant to which such stockholders agreed, subject to the terms thereof, to vote a portion of their shares of Trubion common stock equaling approximately 35% of the outstanding shares of Trubion common stock in favor of the approval and adoption of the Merger Agreement and the transactions contemplated thereby, and against, among other things, other competing transactions (as defined in the Merger Agreement). Each stockholder also agreed to abide by a no-shop prohibition prohibit them from soliciting competing proposals.  Finally, each stockholder also granted Emergent an irrevocable proxy to vote the specified amount of shares subject to the Support Agreements.

*Financial Benefits Received by the Individual Defendants*

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

56.    Moreover, each of the Individual Defendants are receiving financial benefits in the Proposed Transaction that are not equally shared by the Company's public stockholders.

57.    Each of the Individual Defendants currently hold unvested stock options of the Company that, upon consummation of the Proposed Transaction, will vest and will be exchanged for a cash payment equal to the difference between $4.55 and the exercise price of the option, and one CVR for each option.  Defendant Gillis owns $90,000 unvested options and Defendants Heron, Brettman, Hove, Mann, Saks, and Schnell each own 5,000 unvested options that will vest pursuant to the Merger Agreement. While the Company's public shareholders are being forced to receive a combination of $1.365 in cash and 0.1641 shares Emergent stock as their upfront payment, the Individual Defendants' stock options are being exchanged solely for cash.

58.    Accordingly, should the price of Emergent common stock drop below $19.40 upon the effective time of the merger, the Company's public stockholders will receive more for each of their shares than the Individual Defendants will receive when they cash out their options. And indeed, as of September 20, 2010, Emergent common stock traded well below $19.40 per share, closing at $18.80 per share on September 20, 2010 and having not traded as high as $19.40 per share August 10, 2010.

59.    Based on the aforementioned, the Proposed Transaction is wrongful, unfair and harmful to Trubion's public shareholders, and represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members.  The Proposed Transaction is an attempt to deny Plaintiffs and the other members of the Class their rights while usurping the same for the benefit of defendants on unfair terms.

***The Materially Misleading and Incomplete Registration Statement***

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

60.     On September 13, 2010, Emergent filed the Registration Statement with the SEC in connection with the Proposed Transaction. The Registration Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

*Disclosures Concerning the Financial Analyses Conducted by MTS*

61.     For example, the Registration Statement completely fails to disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by MTS, the Company's financial advisor, so that shareholders can properly assess the credibility of the various analyses performed by MTS and relied upon by the Board in recommending the Proposed Transaction.  For example, the Registration Statement must disclose the financial projections and forecasts of the Company and the financial projections and forecasts of Emergent relied upon by MTS in rendering its fairness opinion.

62.     With respect to the *Discounted Cash Flow Analysis* of Trubion conducted by MTS, the Registration Statement must disclose (a) the criteria used to select the discount rate range of 10% to 12%; (b) the assumptions and criteria used by management to determine the 5% and 26% probability of success rates used in the analysis; (c) the specific calculations made by MTS when it "applied" the 5% and 26% probability of success rates to the Company's free cash flows; and (d) the manner in which the Company's terminal value was calculated.

63.     With respect to the *Comparable Companies Analysis* of Trubion, the Registration Statement must disclose (a) the criteria used to determine which companies were considered "similar" to the Company and used in the analysis; (b) the equity values, net cash, and enterprise values observed for each company; and (c) the specific calculations made by MTS to arrive at the $4.00 to $8.00 per share value range calculated in the analysis.

COMPLAINT - 19

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

64.     With respect to the *Comparable Acquisitions Analysis* of Trubion, the Registration Statement must disclose (a) the criteria used to determine which transactions were considered "similar" to the Company and used in the analysis; (b) the one day premium, the upfront consideration, the potential contingency payments and the total transaction value observed for each transaction; and (c) the specific calculations made by MTS to arrive at the $8.00 to $12.00 per share value range calculated in the analysis.

65.     With respect to the *Discounted Cash Flow Analysis* of Emergent conducted by MTS, the Registration Statement must disclose (a) the criteria used to select the discount rate range of 15% to 25%; (b) the comparable companies used by MTS to derive the terminal value multiples; and (c) the criteria used to select a tax rate of 40% in the Management Case analysis while only using a 35% tax rate in the Wall Street Case analysis.

66.     With respect to the *Forward P/E Analysis* of Emergent conducted by MTS, the Registration Statement must disclose (a) the criteria used to determine which companies were considered similar to Emergent; (b) the multiples observed for each company (or at least the high/low range); and (c) the criteria used to select a discount rate of 20%.

67.     With respect to the *Comparable Companies Analyses* of Emergent conducted by MTS, the Registration Statement must disclose (a) the comparable companies used in the analysis; (b) the p/e multiples observed for each company; and (c) the criteria used to select the 17.5x to 27.5x range used in the analysis.

68.     With respect to the *Discounted Cash Flow Analysis* of the pro form combined company, the Registration Statement must disclose (a) the criteria used to select the discount rate range of 15% to 25%; and (b) the comparable companies used to calculate the terminal value of the combined company. With respect to the *Comparable Companies Analysis* of the pro form

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

combined company, the Registration Statement must disclose the criteria used to select the discount rate of 20.0%.

*Disclosures Concerning the Financial Analyses Conducted by Wedbush Securities Inc.*

69.     In addition, the Registration Statement completely fails to disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by Wedbush Securities Inc. ("Wedbush"), Emergent's financial advisor. For example, the Registration Statement must disclose the financial projections and forecasts of the Company and the financial projections and forecasts of Emergent relied upon by Wedbush in rendering its fairness opinion. With respect to the financial analyses conducted by Wedbush, the Proxy is deficient and should provide, *inter alia*, the following:

(i)     The specific calculations made by Wedbush to arrive at Trubion's enterprise value for the merger of $101.1 million and the risk adjusted enterprise value of $84.5 million calculated in the *Risk-Adjusted Enterprise Value – Discounting Present Value of CVRs* analysis.

(ii)    The enterprise values for each company observed in the *Comparable Public Company Analysis*, and the conclusions drawn by Wedbush from the analysis.

(iii)   The enterprise values for each transaction in the *Comparable Merger and Acquisitions Transactions* analysis, and the conclusions drawn by Wedbush from the analysis.

(iv)    The premiums observed for each transaction in the *Premiums Paid Analysis*.

(v)     The criteria used to select the discount rate range of 35% to 45% used in the analysis.

*Disclosures Concerning MTS, the Company's Financial Advisor*

70.     The Registration Statement omits material information regarding the financial advisor retained in connection with the Proposed Transaction. Specifically, the Registration

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

Statement states that in addition to its $1.1 million transaction fee that it will receive if the merger is consummated, MTS will also receive "additional transaction fees based on a percentage" of future CVR payments, but fails to disclose what percentage of future CVR payments will MTS receive. In addition, the Registration Statement states that "MTS has provided investment banking services to Trubion from time to time" but fails to disclose what services were provided and the amount of compensation received or to be received for such services. The Registration Statement must also disclose whether MTS has provided any services to Emergent in the past and if so to disclose the nature of such services and the amount of compensation received or to be received for such services. It is material for shareholders to be informed as to any financial and economic interests MTS or its clients have in the Proposed Transaction or in the parties involved that could be perceived or create a conflict of interest.

*Disclosures Concerning the Events Leading up to the Merger*

71.     The Registration Statement also fails to describe material information concerning the sales process conducted by the Company, including the criteria used to select potential partners and the discussions and negotiations held with such partners.  For example, the Proxy:

(i)     Fails to disclose the criteria used to select the 17 potential acquirors contacted by MTS and Trubion between November 2009 and August 2010, as well as how many partners were strategic and how many were financial.

(ii)    Fails to disclose whether Companies D and Emergent were among the 17 parties contacted.

(iii)   States that during the first half of 2009, members of Trubion's management team "continued to meet with potential partners" but fails to disclose adequate information regarding how many parties were met with; whether these meetings were the result of a solicitation process or whether they were unsolicited; and the results of such meetings.

(iv)    Fails to disclose the reasons discussions with Company D ended in March 2010.

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

(v)    States that on June 29, 2010, MTS "delivered a presentation regarding the financial analyses of certain strategic options available to the company" but fails to disclose the strategic options discussed, and the nature and results of the analyses.

(vi)   Fails to disclose the reasons Company C declined to pursue a business combination with the Company in June 2009; the reasons Company A ceased discussion with the Company in July 2009; and the reasons discussion with Company B regarding a business combination "did not progress further" as of July 31, 2009.

It is absolutely necessary for shareholders to receive a Registration Statement that provides all material disclosures related to the sales process in order for shareholders to be able to cast a fully informed decision regarding the Proposed Transaction.

72.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIM FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty – Failure to Maximize Shareholder Value
### (Against All Individual Defendants)

73.    Plaintiff repeats all previous allegations as if set forth in full herein.

74.    As Directors of Trubion, the Individual Defendants stand in a fiduciary relationship to Plaintiff and the other public stockholders of the Company and owe them the highest fiduciary obligations of loyalty and care.  The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize Trubion's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

75.    As discussed herein, the Individual Defendants have breached their fiduciary duties to Trubion shareholders by failing to engage in an honest and fair sale process.

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

76.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Trubion's assets and will be prevented from benefiting from a value-maximizing transaction.

77.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

78.     Plaintiff and the Class have no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty -- Disclosure**
**(Against Individual Defendants)**

79.     Plaintiff repeats all previous allegations as if set forth in full herein.

80.     The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting Trubion's shareholders.

81.      As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

82.     As a result, Plaintiff and the Class members are being harmed irreparably.

83.     Plaintiff and the Class have no adequate remedy at law.

**COUNT III**
**Aiding and Abetting**
**(Against Trubion and Emergent)**

84.     Plaintiff repeats all previous allegations as if set forth in full herein.

85.     As alleged in more detail above, Trubion and Emergent are well aware that the Individual Defendants have not sought to obtain the best available transaction for the Company's

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

public shareholders.   Defendants Trubion and Emergent aided and abetted the Individual Defendants' breaches of fiduciary duties.

86.     As a result, Plaintiff and the Class members are being harmed.

87.     Plaintiff and the Class have no adequate remedy at law.

**COUNT IV**
**Violations of Section 14(a) of the Exchange Act**
**and Rule 14a-9 Promulgated Thereunder**
**(Against Individual Defendants)**

88.     Plaintiffs repeat all previous allegations as if set forth in full herein.

89.     Defendants have issued the Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

90.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

91.     Specifically, the Proxy violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

92.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiffs and the Class will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

1      **WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as

2  follows:

3      (A)    declaring this action to be a class action and certifying Plaintiff as the

4  Class representatives and his counsel as Class counsel;

5      (B)    declaring that the Proxy contained misleading statements of material fact

6  and omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9

7  promulgated thereunder and that Trubion and the Individual Defendants violated said provisions;

8      (C)    enjoining, preliminarily and permanently, the Proposed Transaction;

9      (D)    in the event that the transaction is consummated prior to the entry of this

10  Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

11      (E)    directing that Defendants account to Plaintiff and the other members of the

12  Class for all damages caused by them and account for all profits and any special benefits

13  obtained as a result of their breaches of their fiduciary duties;

14      (F)    awarding Plaintiff the costs of this action, including a reasonable

15  allowance for the fees and expenses of Plaintiff's attorneys and experts; and

16      (G)    granting Plaintiff and the other members of the Class such further relief as

17  the Court deems just and proper.

18  Dated: October 4, 2010

19

20  JOHN W. HATHAWAY, PLLC

21  By    *John W. Hathaway*

22      John W. Hathaway
        701 Fifth Avenue, Suite 4600
23      Seattle, Washington 98104
        Tel: (206) 624-7100

24

25      *Attorney for Plaintiff*

**JOHN W. HATHAWAY, PLLC**
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX

1

LEVI & KORSINSKY, LLP
Joseph Levi, Esq.

2

William Scott Holleman, Esq.
30 Broad Street, 15th Floor

3

New York, New York 10004
Tel: (212) 363-7500

4

Fax: (212) 363-7171
(to be admitted *pro hac vice*)

5

6

   *Attorneys for Plaintiff*

7

Law Office of Abe Shainberg
Abe Shainberg, Esq.

8

132 East 43rd Street
Suite 512

9

New York, NY 10017
Tel: (212) 425-7286

10

(to be admitted *pro hac vice*)

11

   *Attorney for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOHN W. HATHAWAY, PLLC
ATTORNEYS AT LAW
701 FIFTH AVENUE, SUITE 3401
SEATTLE, WA 98104
206.624.7100/206.624.9292 FAX